UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**Mohamed SAKO,**<br>　　　　　　**Defendant.** | Crim. No. 13-258 (KM)<br><br>**MEMORANDUM OPINION** |

In an accompanying Order, I have decided ten motions (ECF No. 33) filed on behalf of the defendant, Mohamed Sako, by his counsel, Lorraine Gauli-Rufo, Esq. My underlying reasons were, for the most part, expressed on the record on January 8, 2014, at oral argument of the motions. I file this short Memorandum Opinion, however, to amplify my reasoning as to two of them:

　　7. Defendant's motion for "a hearing to determine the admissibility of the evidence seized in this matter."

　　8. Defendant's motion for "a hearing to determine the admissibility of alleged statements."[1]

I denied both of these motions without an evidentiary hearing, because I found that the defendant had not articulated any substantial dispute of fact that was material to the outcome of the motions.

　　There is little if any substantial dispute as to the government's statement of facts. Defendant Sako did not submit an affidavit or other statement controverting the government's statements and evidence. I nevertheless discuss below certain of defense counsel's statements at oral argument and in the brief she filed on Sako's behalf.

　　On the night of July 31, 2012, Mr. Sako arrived at Newark Liberty International Airport on a flight from Nairobi, Kenya *via* London. Customs and Border Protection ("CBP") had Sako on a lookout list. (At oral argument it was

---

[1] 　　The numbering follows that in the accompanying order. Motion no. 7, although it refers to "seized" evidence, also encompasses the x-ray evidence.

stated that the basis for his presence on the list was his association with the street address of his brother Maurice, who had earlier been charged with smuggling drugs inside his body. Defense counsel disputed whether the address was truly that of Maurice.)

Defendant Sako's passport had been issued just one month before. He had visited Kenya, said to be a drug source country. The visit had lasted only one week. He had purchased his airline ticket with approximately $3000 in cash.

CBP Officer Ventura questioned Sako. Sako appeared nervous. He said he had visited Kenya to attend his cousin's wedding, but did not know the name of the bride. His suitcase contained nothing the Officer considered to be wedding attire. Sako told Officer Ventura that he was employed, but could not state his salary or his employer's phone number. He then said he was unemployed. He said his cousin had purchased the airline ticket for him, but he did not know what his cousin did for a living.

Ventura subjected Sako to a pat-down search. Sako stated that he knew his rights and asked for a lawyer. Ventura told Sako he suspected him of internal drug smuggling, and asked Sako to consent to be x-rayed. Sako signed an x-ray consent form, a copy of which was attached to the government's papers. As Ventura was explaining the x-ray procedure, Sako admitted that he had swallowed some 74 pellets of heroin. Sako asked to use the rest room. When he did, he expelled some 16 pellets of heroin in the presence of the officers.

A photo produced in discovery, taken in the early hours of August 1, 2012, showed Sako seated, with his hands behind his back, and the 16 pellets before him on a table. Defense counsel suggested that Sako may have been handcuffed at that time. Sako was transported to Beth Israel Hospital in Newark to be x-rayed.

In the morning, at the hospital, two Homeland Security Investigations (HSI) Special Agents took a statement from Sako. Sako waived his *Miranda* rights in writing. He made a statement in which he admitted he had agreed to smuggle 80 pellets of heroin in exchange for $12,000.

X-rays showed the presence of the pellets in Sako's stomach and intestines. Over the next few days, he expelled the pellets in the presence of CBP officers. The heroin in the pellets totaled approximately 1.38 kilograms.

Sako seeks to suppress three categories of evidence:

1) The statements he made at the airport.
2) The x-rays and the heroin pellets.
3) The *Mirandized* statement taken by the agents at the hospital.

He requests an evidentiary hearing.

An evidentiary hearing is not a discovery device. Nor is it an opportunity simply to probe the government witnesses' testimony for weaknesses. Rather, a hearing is appropriate when the papers establish that facts material to the suppression issue are meaningfully in dispute. *See United States v. Voigt,* 89 F.3d 1050, 1067 (3d Cir. 1996). The burden is on the plaintiff to establish the necessity of a hearing by proffering definite, specific, detailed, and non-conjectural facts. *See United States v. Rodriguez,* 69 F.3d 136, 141 (7th Cir. 1995). A court may require that such facts be proffered by affidavit. Thus, the U.S. Court of Appeals for the First Circuit has upheld denial without a hearing of a motion to suppress drugs seized from an automobile—at first, because defendant had failed to submit an affidavit, and later (when he did), because the affidavit did not contain specific, material facts:

> As for [defendant's] faulting the judge for not convening an evidentiary hearing—an issue we review for abuse of discretion, *see, e.g., United States v. Allen,* 573 F.3d 42, 50–51 (1st Cir. 2009)—we note that Guzmán had to satisfy an entry-level burden of showing that the police's warrantless search did not come within "any" recognized warrant exception, *id.* at 51 (quoting *United States v. Calderon,* 77 F.3d 6, 9 (1st Cir.1996)), including the two we just mentioned. And this he did not do, for he alleged nothing "definite, specific, detailed, and nonconjectural" that could defeat application of either exception here. *See id.* (quoting *Calderon,* 77 F.3d at 9).

*See U.S. v. Acosta-Colon,* --- F.3d ----, 2013 WL 6654386 at *20 (1st Cir., Dec. 18, 2013). *See also United States v. Ruggiero,* 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993).

3

As I stated at oral argument, however, I would not deny Sako's motion based merely on the absence of an affidavit. Nevertheless, I required that factual disputes of consequence to the resolution of the suppression motion be stated and identified.

Sako did not submit an affidavit. He did not even really proffer an alternative version of the events. At oral argument I invited defense counsel to proffer how her client's version of the events differed from that of the government. Sako, personally or through counsel, did not assert any factual position significantly at odds with that of the government (and his counsel was compelled in all candor to acknowledge as much). Sako's counsel did say that the government's position, as revealed in discovery, contained inconsistencies. In short, Sako sought to demonstrate that the government had created an issue of fact with itself. But he did not point specifically to any alleged inconsistencies that were substantial and material to the suppression issues.

I emphasize that the only events at issue were interactions with government personnel at which Sako himself was present. In my view, where the facts are in the defendant's control, he must ordinarily state his alternative version of the facts, so the court can assess the need for a hearing. And factual issues, of course, can only be material, or not, in light of the governing law.

At the country's border, Constitutional rights are limited. Every individual is subject, for example, to questioning by Customs officers and searches of baggage, without any individualized suspicion whatever. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 539-40 (1985); *United States v. Kiam,* 432 F.3d 524, 529-30 (3d Cir. 2006); *United States v. Ezeiruaku,* 936 F.2d 136, 140-41 (3d Cir. 1991). Among the permissible goals of such screening is a determination as to whether a person is engaging in criminal activity or concealing contraband. *See United States v. St. Vallier,* 404 F. App'x 651, 657 (3d Cir. 2010). There is no entitlement to *Miranda* warnings and no right to counsel. Moreover, a subject's request for counsel does not require that questioning cease. *Id.* (citing *Kiam, supra*).

That broad border-search authority does not depend on whether a CBP officer subjectively suspects criminality. It is *not* the case, for example, "that if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the alien before questioning him on any

4

subject." *Kiam,* 432 F.3d at 530. Thus, in *Kiam,* it was permissible for a Customs officer to interrogate a traveler without *Miranda* warnings and elicit that he was engaged in smuggling aliens into the country. That principle is not unlimited, but it extends until the proceeding ceases to be a border search and becomes solely a criminal investigation. *Id.* ("If the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution ... this line has been crossed.") Thus *Miranda* warnings may be required for custodial interrogation after the officers have concluded a border investigation that has produced an admission of criminality or unequivocal evidence of criminal activity, such as concealed narcotics. *See id.* at 530 n.6 ("For example, if an alien admits to an immigration/customs inspector that he is smuggling drugs into the country, it might be improper for the inspector to proceed to question the alien, without *Miranda,* regarding the weight, purchase, and plans for, the drugs he is smuggling"); *id.* at 531 ("At the point at which Inspector Roman ceased questioning about administrative admissibility and called in a criminal investigator, however, *Miranda* was implicated").

Sako (or rather his counsel) disputed the basis of the lookout warning that allegedly initially alerted the CBP officers to him. He did not dispute any of the other facts that aroused the CBP's suspicions and led to further questioning. Sako, or his counsel, never proffered that he did not in fact give inconsistent answers regarding the circumstances of his trip, the source of the money for his ticket, and so on. It is possible to quibble with one or more of these factors; an American CBP official, for example, might or might not recognize clothing appropriate for a wedding in Kenya. But it really does not matter. As a matter of law, *no* particular suspicion would have been required in order for Sako to be questioned by CBP. *Montoya de Hernandez, supra; Kiam, supra; St. Villiers, supra.*

True, Sako's initial answers led CBP to question him further. But there is no requirement that the officers pass some threshold of suspicion to justify each successive stage of questioning. For example, a person seeking entry "may be taken out of a primary inspection line for secondary questioning, or as here, removed from a plane before reaching that initial line." *Kiam,* 432 F.3d at 529-30. There is no requirement that the officers "cut off their questioning if they think they may be going beyond what could be considered 'routine' immigration questioning." *Id.* at 530.

It is perhaps here that the legal positions of the government and the defense most critically diverge. In defense counsel's view, to request voluntary consent to an x-ray search shortly after Sako had requested counsel constituted an "unlawful search," then and there, tainting all that followed. In counsel's view, this "non-routine search" required reasonable suspicion, and she seeks a hearing on that issue. As noted, a non-routine, intrusive, body search (I assume this applies to an x-ray), performed over the person's objection, may require reasonable suspicion. *See, e.g., Montoya de Hernandez, supra; United States v. Ezeiruaku*, 936 F.2d 136, 140 (3d Cir. 1991). The facts here suggest reasonable suspicion, but I need not make that determination, because such a search may also permissibly occur based on consent. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Sako's counsel acknowledges that immediately after the questioning and pat-down, the agent requested, and got, Sako's written consent to be x-rayed (and that Sako's admission that he had swallowed the heroin pellets followed immediately).

The validity, or not, of the CBP officers' suspicions therefore need not be settled factually. The government contends that the x-ray search was based, not on probable cause or suspicion, but on consent in writing. There is no requirement that a Customs officer possess any particular level of suspicion before requesting a voluntary consent to a search. Indeed, even outside the border context, no particular level of prior suspicion is required before requesting consent to search. *Florida v. Bostick*, 501 U.S. 429 (1991). Constitutionally, there is no harm in asking. Sako's single claim that his consent was coerced—the contention that he was denied counsel—is not material because, as a matter of law, Sako did not have any right to counsel.

It is undisputed that Sako received no *Miranda* warnings at the airport. Again, however, even a legitimate factual dispute would have no legal consequences, because *Miranda* warnings are not required in the context of border questioning by CBP officers. I consider that under *Kiam, supra,* a *Miranda* duty may arise if officers, having exhausted their border control duties, continue to question the subject to gather evidence for a criminal prosecution. But that did not happen here, on any version of the facts.

The earliest time that any *Miranda* duty could theoretically have arisen was when the CBP officers' investigation produced clear evidence of criminal activity (for example, the first 16 heroin pellets). Sako did not suggest, even through informal statements of counsel, that the agent was incorrect in stating that Sako confessed just after he had consented in writing to be x-rayed. But

6

even if Sako's un-Mirandized statement had occurred after the recovery of the first 16 pellets, I think that elicitation of whether Sako had swallowed additional pellets would have fallen within the scope of the CBP's border investigation. The CBP did not allegedly elicit from Sako the background of the offense, the identities of his criminal associates, or like matters. The only statement elicited was that Sako had swallowed 74 (actually 80) pellets, 64 of which were still within his body. It was critical to the CBP's border security functions to find out, right now, whether Sako was currently carrying additional contraband that needed to be interdicted.[2] Under *Kiam* and other cases cited above, it is not relevant that this information might also be relevant to prove criminal conduct.

I repeat that Sako was present at these events. To establish the need for a hearing he was obligated to state, at least through counsel, that his version of the events differed materially from the government's version. He did not. The motion for an evidentiary suppression hearing will be denied as to Sako's statement to the CBP officers at the airport that he had swallowed 74 heroin pellets.

As to the hospital's x-ray photographs, there is likewise no basis for suppression and no factual issue requiring a hearing. Sako signed a written consent form, before at least one witness. The form recites that he gave his consent freely, without coercion. Defense counsel failed to suggest any facts undermining that consent. On that issue, counsel makes a single argument: that Sako's signing of the consent form "immediately after he invoked his Constitutional rights and requested an attorney suggests that there may have been some coercion present." (Def. Br. at 11) Setting aside the "may have"—we do not hold hearings on hypothetical possibilities—the fact remains that Sako possessed no such right to counsel. *See, e.g., Kiam, supra.* Denial of a nonexistent right cannot be deemed coercive.

Here, as in *Kiam,* the CBP officers turned the case over to the criminal investigators once they had good evidence of criminality. The following

---

[2] This entire discussion, moreover, is premised on the defendant-favorable assumption that Sako made his statement in response to "interrogation." *See generally Rhode Island v. Innis,* 446 U.S. 291, 300 (1980) (for *Miranda* purposes, interrogation is defined as express questioning or the functional equivalent). Sako made his statement shortly after he signed the consent to be x-rayed, perhaps in recognition that his bluff had failed and detection was inevitable. But, as I say, I have assumed *arguendo* that his admission came in response to questioning.

7

morning, at the hospital, HSI Special agents spoke with Sako. For the reasons stated below, there is no basis for a hearing as to the Mirandized statements that Sako made to the HSI Special Agents at the hospital.

Sako's counsel does not deny that he was administered *Miranda* warnings and that he waived his rights in writing. She states only that he was 20 years old, that he was in the hospital, and that he had possibly been handcuffed for some period, five or six hours previously. (She did not contend that Sako was handcuffed at the time of the statement). The government does not appear to deny any of these facts, and I accept them for purposes of this analysis.[3] Counsel stated in her brief that Sako "might" have been given medication that affected his mental state; at oral argument, however, she acknowledged that Sako was given only a laxative.

At the hospital, Sako signed a *Miranda* waiver form. He initialed it in seven places, and signed it before witnesses. He checked the boxes indicating that he understood and wished to waive his rights, and the agents checked the boxes indicating that Sako read and acknowledged that he understood the form. True, Sako was in the hospital, but only to be x-rayed; he was not ill or impaired in any way, and he received no medication that would have affected his ability to consent. He had possibly been handcuffed for transport some hours previously. Arrest (technically, "custody"), however, is a prerequisite for every successful invocation of *Miranda,* and some period of handcuffing is a routine feature of arrest. Sako's relatively young age, too, is not contested, but it means little standing alone. These facts simply do not rise to the level of requiring a hearing as to the voluntariness of Sako's well-documented waiver of his *Miranda* rights. As to the statements in the hospital, too, the suppression motion will be denied.

Dated: January 10, 2014

_____
KEVIN MCNULTY, U.S.D.J.

---

[3] The photograph shows only that defendant's hands were out of sight behind his back. The government conceded for purposes of argument that it would not have been unusual to handcuff a suspect while he was being transported to the hospital. The presence in the photo of the 16 heroin pellets that had already been expelled establishes that the photo must have been taken sometime not too long before Sako was transported to the hospital.